**FILED**
**JUL 3 2008**
**MAGISTRATE JUDGE SUSAN E. COX**
**UNITED STATES DISTRICT COURT**

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

XAVIER HERRERA,
JUAN GUTIERREZ, and
FEDRICK FARMER

**CRIMINAL COMPLAINT**

CASE NUMBER:

**08 CR 526**

**MAGISTRATE JUDGE COX**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about July 3, 2008, in Cook County, in the Northern District of Illinois, and elsewhere, defendant(s)

did conspire with one another and others to knowingly and intentionally possess with the intent to distribute a controlled substance, namely, 500 grams or more of mixtures containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Sections 841(a)(1);

in violation of Title 21, United States Code, Section 846.

I further state that I am a Special Agent for the Drug Enforcement Administration and that this complaint is based on the following facts:

**See attached affidavit**

Continued on the attached sheet and made a part hereof: __X__ Yes ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

July 3, 2008 at 4:40PM          at    Chicago, Illinois
Date                                  City and State

MAGISTRATE JUDGE SUSAN E. COX           _____
Name & Title of Judicial Officer         Signature of Judicial Officer

STATE OF ILLINOIS    )
                     ) SS
COUNTY OF COOK       )

## AFFIDAVIT

I, Billy Conrad, being duly sworn on oath, state as follows:

1.  I am a Special Agent with the Drug Enforcement Administration ("DEA"), United States Department of Justice, and have been so employed for approximately four years. Since that time, I have been assigned to the DEA Chicago Field Division. In connection with my official DEA duties, I investigate criminal violations of the federal narcotics laws, including, but not limited to, violations of Title 21, United States Code, Sections 841, 843, 846, and 848. I have been involved in various types of investigations, in the debriefing of defendants, witnesses, informants, and others who have knowledge of narcotics trafficking, and investigations involving the laundering and concealing of proceeds of drug trafficking. I received specialized training in the enforcement of laws concerning the activities of narcotics traffickers.

2.  The information set forth in this Affidavit is based upon my participation in this investigation, interviews of witnesses, information obtained from cooperating sources and other law enforcement officers, and my experience and training. The recitation of facts contained in this Affidavit is not meant to be a complete narrative of all that has occurred in connection with this investigation, but is only a summary of facts necessary to show probable cause that Xavier HERRERA, Juan GUTIERREZ and Fedrick FARMER conspired to knowingly and intentionally possess with intent to distribute a controlled substance, namely, 500 grams or more of mixtures containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

## Investigation

3.  In or around March 2008, Individual A was arrested by DEA agents for conspiring to distribute methamphetamine. After he was arrested, Individual A agreed to cooperate with the government in exchange for a possible reduction in his sentence. Individual A told DEA agents that in 2006, he transported two loads of cocaine from Juarez, Mexico to the Chicago, Illinois area. Individual A stated that each load contained approximately 10 kilograms of cocaine. Individual A identified the recipient of the two drug loads as an individual named "Javier." Individual A identified Javier's telephone number as (219) 805-5016, which was programmed in the cellular telephone recovered from Individual A during his arrest. Individual A stated that he delivered the two shipments directly to "Javier" at a house in Indiana. Individual A also told DEA agents that he believed "Javier" was a police officer.

4.  On March 13, 2008, at approximately 7:30 p.m., Individual A placed a recorded call to "Javier" at telephone number (219) 805-5016. Javier was later identified as Xavier HERRERA.[1] During this call, Individual A told HERRERA that he could provide cocaine to HERRERA.[2] Individual A told HERRERA that he would have another person, the purported source of the cocaine, call HERRERA to discuss the matter further. Shortly after making this initial phone call, Individual A disappeared and is now a fugitive.

---

[1] Javier was identified as Xavier HERRERA by DEA agents and a cooperating source during a recorded face-to-face meeting between HERRERA and the cooperating source on April 15, 2008. *See infra.* Furthermore, telephone number (219) 805-5016 is subscribed to Xavier HERRERA.

[2] The recorded conversations throughout this Affidavit have been summarized, and parentheses have been placed around language that represent my or other agents' understanding of what is being said during the recordings based on the contents and context of the conversations, my experience as a law enforcement officer, and the experience of other law enforcement officers in this investigation. In addition, language that is quoted from the recorded conversations throughout this Affidavit is based upon agents' review of the recorded conversations. Quoted material is not intended to be a final transcription of the audio recordings from which the quotes are taken.

5. On April 2, 2008, a paid confidential source ("CS") working with the DEA placed a recorded call to HERRERA at telephone number (219) 805-5016. During this conversation, the CS introduced himself as a friend of Individual A and suggested meeting with HERRERA to discuss the possibility of the CS selling multiple kilograms of cocaine to HERRERA. HERRERA agreed to meet with the CS when the CS came to Chicago. The CS told HERRERA that he would call HERRERA again to discuss the transaction further. HERRERA told the CS that he would save the CS's telephone number.

6. On April 14, 2008, at approximately 3:18 p.m. the CS placed a recorded call to HERRERA. During this conversation, HERRERA agreed to meet the CS on April 15, 2008, at the El Gallo Patio Mexican Restaurant in Bridgeview, Illinois.

7. On April 15, 2008, at approximately 3:50 p.m., while in the presence of agents, the CS received a telephone call from HERRERA. The phone call was not recorded. According to the CS, during the phone call, HERRERA told the CS that he was twenty minutes away from the restaurant where they had agreed to meet. After the phone call, agents provided the CS with concealed audio and video recording devices, and drove the CS to the El Gallo Restaurant.

8. At approximately 4:30 p.m., the CS entered the El Gallo restaurant and met with HERRERA. During this meeting, HERRERA told the CS that he (HERRERA) would be the one conducting the tranaction. HERRERA also told the CS that he was ready to conduct the transaction, but had to check with his people to finalize the deal. HERRERA said that he could sell each kilogram of cocaine that he purchased from the CS for $21,000.00 United States Currency, and therefore he was looking to purchase the cocaine around the price of $18,000.00 per kilogram of cocaine. HERRERA stated that if the price was right, he would be able to purchase ten kilograms of cocaine. HERRERA asked the CS if they could continue doing

business together after this transaction. HERRERA also indicated that another friend of his might be interested in purchasing cocaine. During the conversation, both the CS and HERRERA conversed about past instances of losing kilograms of cocaine and negotiating the price of kilograms of cocaine.

9. At approximately 5:30 p.m., after he finished meeting with the CS, agents observed HERRERA exit the El Gallo restaurant and get into a black Toyota Tundra. Agents were not able to observe the license plate number of the black Tundra during this meeting.

10. Several minutes after HERRERA left the restaurant, the CS exited the restaurant and was picked up by DEA agents. The CS was shown a photograph of Xavier HERRERA taken from the East Chicago Police Department files,[3] and the CS confirmed that HERRERA was the person who he had met with that day.

11. Over the next week, the CS and HERRERA spoke via telephone on several occasions. Most of these telephone conversations took place outside of the presence of agents and were not recorded. According to the CS, during these conversations, the CS and HERRERA engaged in negotiations regarding the price per kilogram of cocaine that the CS would sell to HERRERA.

12. On April 23, 2008, at approximately 7:30 p.m., outside of the presence of agents, the CS received a telephone call from HERRERA. This telephone call was not recorded. According to the CS, HERRERA told the CS that he was calling because he wanted to maintain contact with the CS. The CS told HERRERA that he could stay in Chicago for another day or

---

[3]HERRERA is an East Chicago police officer.

4

two to finalize the transaction, but that he was planning to travel to Mexico and would be out of the country for several weeks. HERRERA told the CS that he would call him back.

13. Approximately 15 minutes later, outside of the presence of agents, the CS received another telephone call from HERRERA. This telephone call was not recorded. According to the CS, HERRERA told the CS that he could not guarantee the transaction would go forward before the CS left for Mexico. HERRERA told the CS to call HERRERA when the CS was coming back from Mexico so that HERRERA could have everything ready for the proposed cocaine transaction.

14. On or about April 25, 2008, the CS left the United States and traveled to Mexico. The CS stayed in Mexico until on or about June 23, 2008. During the period of time when the CS was out of the country, the CS talked to HERRERA approximately seven times by telephone. None of these conversations were recorded. According to the CS, during these conversations, the CS and HERRERA talked about the CS's return to Chicago. During the last of these conversations, which took place on June 23, 2008, the CS advised HERRERA that the CS would be returning to Chicago on June 25, 2008, and would contact HERRERA when he returned.

15. On June 26, 2008, at approximately 10:30 a.m., the CS placed a recorded telephone call to HERRERA. During this conversation, the CS asked HERRERA how much "material," meaning kilograms of cocaine, HERRERA wanted to purchase. The CS also told HERRERA that demand for cocaine was high. HERRERA told the CS that he could not meet with the CS that day, but told the CS that he would talk to several people and asked to meet with the CS the next day, June 27, 2008. The CS agreed to meet with HERRERA on June 27.

16. On June 27, 2008, at approximately 9:50 a.m., the CS placed a recorded telephone call to HERRERA. During the phone call, HERRERA and the CS agreed to meet at the El Gallo

5

Patio Mexican Restaurant at 11:00 a.m. that day. At approximately 10:40 a.m., agents provided the CS with concealed audio and video recording devices, and drove the CS to the El Gallo Restaurant.

17.  At approximately 11:00 a.m., the CS arrived at the El Gallo restaurant. At approximately 11:30 a.m., HERRERA arrived at the El Gallo restaurant in the same black Tundra as he drove to the April 15 meeting. Agents were able to observe the license plate on the black Tundra, Indiana license plates 627496, which is registered to Xavier HERRERA. HERRERA went inside the El Gallo restaurant and met with the CS. During this meeting, HERRERA told the CS that he had someone who is interested in purchasing 10 kilograms of cocaine, and two other people who are interested in purchasing several additional kilograms of cocaine. In total, HERRERA said he would purchase sixteen kilograms of cocaine. HERRERA and the CS agreed on a price of $19,000 per kilogram of cocaine.

18.  At approximately 12:10 p.m., agents observed HERRERA exit the El Gallo restaurant and depart in the black Tundra.

19.  On July 1, 2008, at approximately 10:30 a.m., the CS placed a recorded telephone call to HERRERA. During the phone call, HERRERA and the CS agreed to meet at the El Gallo Patio Mexican Restaurant that day. At approximately 1:15 p.m., the CS placed a recorded telephone call to HERRERA. During the phone call, HERRERA and the CS agreed to meet at the El Gallo restaurant in approximately one hour. Agents then provided the CS with concealed audio and video recording devices, and drove the CS to the El Gallo Restaurant.

20.  At approximately 2:20 p.m., the CS arrived at the El Gallo restaurant and met with HERRERA. During this meeting, HERRERA said that he would bring the money to the location of the transaction. HERRERA said that he would purchase 20 kilograms of cocaine.

HERRERA also said that he would be making approximately $2000 per kilogram. HERRERA and the CS also talked about the quality of the cocaine, which HERRERA referred to as "coca." The CS told HERRERA that the cocaine was 90% pure.

21. At approximately 2:50 p.m., agents observed HERRERA exit the El Gallo restaurant and depart in the black Tundra.

22. Over the next two days, between July 1, 2008, and July 3, 2008, HERRERA and the CS talked via telephone on several occasions in an effort to finalize the details of their transaction. Some of these phone calls were not recorded. According to the CS, on July 2, 2008, HERRERA told the CS that HERRERA could only purchase 5 kilograms of cocaine, and that he would contact the CS early the next morning.

23. On July 3, 2008, at approximately 8:15 a.m., the CS placed a recorded telephone call to HERRERA. During the phone call, HERRERA told CS that he was ready to go. HERRERA and the CS agreed to meet later that morning. At approximately 10:15 a.m., the CS placed a recorded telephone call to HERRERA. During the phone call, HERRERA and the CS agreed to meet in the parking lot of a Burger King restaurant located at the corner of Archer and Harlem in Summit, Illinois. At approximately 10:20 a.m., agents provided the CS with concealed audio and video recording devices, and drove the CS to the Burger King parking lot.

24. At approximately 10:35 a.m., the CS an agent working in an undercover capacity arrived at the Burger King parking lot. Approximately two minutes later, surveillance agents ("surveillance") observed two vehicles arrived at the Burger King parking lot. The first vehicle to arrive was the black Tundra, which was driven by HERRERA. Individual B was in the passenger seat. The second vehicle to arrive was a dark grey Chevrolet Impala. A black male, later identified as Fedrick FARMER was driving the grey Impala and a Hispanic male, later

identified as Juan GONZALEZ, was sitting in the passenger seat. After the two vehicles arrived, surveillance observed HERRERA get out of the black Tundra and approach the CS. According to the CS, HERRERA told the CS that he only had enough money for three kilograms of cocaine and asked the CS if he would front the remaining two kilograms of cocaine. The CS refused to front any cocaine, and asked to see the money.

According to the CS, HERRERA then led the CS to the grey Impala. HERRERA and the CS got into the back seat of the grey Impala. Once inside, according to the CS, GONZALEZ handed the CS a duffel bag. The CS opened the duffel bag and looked inside. HERRERA told the CS that there was "sixty . . . and change" inside the duffel bag. The CS understood this to mean that there was a little more than $60,000 inside the duffel bag. After receiving the money from GONZALEZ, the CS got out of the grey Impala, gave the arrest signal, and DEA agents and Summit police officers arrested HERRERA, GONZALEZ and FARMER.

25.     When officers arrested HERRERA, they found a fully-loaded .45 caliber Colt series 90 semi-automatic handgun in HERRERA's waistband. Another unloaded .357 caliber handgun was found in the center console of the black Tundra. HERRERA is an East Chicago police officer, but was not on duty at the time of his arrest.

26.     After he was arrested, HERRERA was advised of his constitutional rights. HERRERA agreed to waive his constitutional rights and speak with arresting officers. HERRERA signed a written statement in which he admitted that he, GONZALEZ and Individual B were brokering a transaction involving 3 kilograms of cocaine in which the CS was the supplier of the cocaine and FARMER was the eventual purchaser of the cocaine. HERRERA said that he met GONZALEZ and FARMER through Individual B. HERRERA further said he would make $500 on the transaction.

26.  After he was arrested, GONZALEZ was advised of his constitutional rights. GONZALEZ agreed to waive his constitutional rights and speak with arresting officers. GONZALEZ signed a written statement in which he admitted that he, HERRERA and Individual B were brokering a transaction involving 3 kilograms of cocaine in which the CS was the supplier of the cocaine and FARMER was the eventual purchaser of the cocaine. GONZALEZ said that he had received a phone call on July 2 from Individual B, who asked him if anyone was looking for kilograms of cocaine. GONZALEZ then called FARMER, who agreed to purchase 3 kilograms of cocaine from GONZALEZ via Individual B.

## Conclusion

Based on the foregoing, Affiant respectfully submits that there is probable cause to believe that Xavier HERRERA, Juan GUTIERREZ and Fedrick FARMER conspired to knowingly and intentionally possess with intent to distribute a controlled substance, namely, 500 grams or more of mixtures containing cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

FURTHER AFFIANT SAYETH NOT.

_____
Billy Conrad
Special Agent
U.S. Drug Enforcement Administration

Subscribed and sworn to before me,
This 3rd day of July, 2008

_____ at 4:40 PM_____
SUSAN E. COX
UNITED STATES MAGISTRATE JUDGE